# EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT MARSHALL MCGUERTY IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, **MARSHALL MCGUERTY**, being first duly sworn, hereby depose and state as follows:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since April of 2020.  I am currently assigned to the HSI Springfield Resident Agent in Charge (RAC) Office. Prior to my assignment to the Springfield RAC office, I was assigned to the HSI Boston Special Agent in Charge (SAC) office, where I participated in investigations pertaining to human trafficking. As a Special Agent with HSI, I am a law enforcement officer of the United States within the definition of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      As a Special Agent, I am responsible for initiating, conducting, and participating in criminal investigations involving allegations of various federal laws including child pornography, human trafficking, drug trafficking, and immigration violations.  I have received training and gained experience in interviewing techniques, arrest procedures, search and arrest warrant applications, the execution of searches and seizures, and various other criminal laws and procedures.

3.      I make this affidavit in support of an application for:

a.      An application for a warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure to search and seize evidence, fruits, and instrumentalities of the Subject Offenses from the following premises as further described in Attachments A-1 (The "Subject Premises"):  62 Edmund Wayne Circle Apt. #D15, Springfield, MA and a 2021 Blue Toyota Corolla,

Massachusetts Registration 1GHT99.

b.    An application for a warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure to search the person of Carlos CASILLAS ("Subject Person") and whatever personal vehicle he is currently operating ("Subject Person") for items described in Attachment A-2.

c.    An application for a warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) of the Federal Rules of Criminal Procedure to search for information associated with the Facebook user ID: 100024593259380, Screen/User Name:  Carlos Casillas ("Subject Facebook Account"), Profile URL:  https://www.facebook.com/people/Carlos-Casillas/100024593259380/, that is stored at premised owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California, for information described in Attachment A-3.

4.   As set forth below, there is probable cause to believe that the Subject Premises, Subject Person, and the Subject Facebook Account contain evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachments B-1 through B-3.

5.    The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

6.   I am currently investigating Carlos Casillas ("CASILLAS") for the following offenses: (collectively, the "Subject Offenses").

### THE SUBJECT OFFENSES

7.    Title 18, United States Code, Section 1591(a) makes it illegal for anyone knowingly, in or affecting interstate commerce, (1) to recruit, entice, harbor, transport, provide,

obtain, or maintain by any means a person, or (2) to benefit, financially or by receiving anything

of value, from participation in a venture which has engaged in an act described in violation of (1)

above, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud,

coercion, or any combination of such means will be used to cause the person to engage in a

commercial sex act.

8.　　　　Title 18, United States Code, Section 2422(a) makes it illegal for anyone to

knowingly persuade, induce, entice, or coerce any individual to travel in interstate commerce to

engage in prostitution or to engage in any illegal sexual activity.

9.　　　　Title 18, United States Code, Section 1952(a) states that "Whoever travels

in interstate or foreign commerce or uses the mail or any facility in interstate or foreign

commerce, with intent to—

1.　　(1)　distribute the proceeds of any unlawful activity; or

2.　　(2)　commit any crime of violence to further any unlawful activity; or

3.　　(3)　otherwise promote, manage, establish, carry on, or facilitate the promotion,

management, establishment, or carrying on, of any unlawful activity,

4.　　and thereafter performs or attempts to perform—

5.　　(A)　an act described in paragraph (1) or (3) shall be fined under this title,

imprisoned not more than 5 years, or both; or (B)　an act described in paragraph (2) shall be

fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be

imprisoned for any term of years or for life."

### *CASILLAS CRIMINAL HISTORY*

10.　　CASILLAS has an extensive criminal history to include twenty-eight adult

arraignments with the majority of the charges being Motor Vehicle violation, Breaking and

Entering and Larceny.  CASILLAS has a current Active Misdemeanor Straight Default Warrant out of Chicopee District Court for operating with a suspended license.  In July of 2019, CASILLAS was arrested for Distribution of a Class B substance (cocaine), the charges were ultimately dismissed. In July of 2011, CASILLAS was arrested for Larceny over $250 along with Breaking and Entering.  In May of 2013, CASILLAS had a restraining order issued against him, which has since been closed.

***PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED***

11.     On October 1, 2021, HSI Springfield received information from Attorney Rebecca Jones-Bloom from Dedham, MA regarding a client she was representing from Boston Juvenile Court.  Attorney Bloom indicated she has been representing this client since August 2021 and is 16 years old. The client has been identified as Minor Victim 2.  Attorney Bloom stated she received information from a Department of Children and Families (DCF) social worker that Minor Victim 2 may be involved in human trafficking, The social worker reported finding Facebook messages between Minor Victim 2 and an adult male from the Springfield area.  Attorney Bloom stated Minor Victim 2 was placed in a group home and that Minor Victim 2 ran away from the group home and is currently reported missing. Attorney Bloom stated she recently contacted the Springfield Police Department and reported Minor Victim 2 missing. Attorney Bloom forwarded HSI Springfield numerous screen shots of Facebook messages between Minor Victim 2's Facebook page and a Facebook account with the vanity name "Carlos Casillas".

12.     On October 1, 2021, HSI Springfield contacted the Springfield Police Department regarding information they received on Minor Victim 2, and the following information was provided.

13.     On or about September 7, 2021, an officer with Springfield Police Department was dispatched to a group home located at 130 Berkshire Street, Springfield, MA. Officers and Agents involved in this investigation know that the Department of Children and Family (DCF) often places minor females in their custody in this group home.   Upon arrival at the scene, the officer encountered a staff member (herein referred to as "Staff Member") of the program, who stated that beginning on September 3, 2021, they had noticed some of the females in the group home were receiving a large quantity of internet phone calls.  The Staff Member identified four females in the home as:

1)     Minor Victim 1 ("MV1"): 13 years old

2)     Minor Victim 2 ("MV2"): 16 years old

3)     Minor Victim 3 ("MV3"): 13 years old

4)     Minor Victim 4 ("MV4"): 16 years old

14.     The Staff Member stated that beginning on September 3, 2021 and continuing over the course of the next few days, the Staff Member overhead conversations pertaining to MV1, MV2, MV3, and MV4 (collectively "Minor Victims") potentially seeing an older male. On September 6, 2021, the Staff Member observed messages on the Facebook account belonging to MV1 between MV1 and the Facebook account with the vanity name "Carlos Casillas".  Based on the review of the messages by the Staff Member, the Staff Member believed that the Minor Victims were all seeing the individual associated with the Facebook account "Carlos Casillas." The Staff Member stated that the Minor Victims are all known to run away from the home and that they believed when they ran away, they were all seeing the individual associated with the Facebook account "Carlos Casillas."

15.     On September 2, 2021, MV1 was reported as a runway from the group home, but subsequently returned to the program.  An officer with the Springfield Police Department along

with a Detective with the Special Victims Unit ("SVU") spoke with MV1 upon her arrival.  MV1 stated that she had been messaging Carlos Casillas ("CASILLAS") on Facebook and had met up with him four times in person.  MV1 believes she started seeing CASILLAS beginning in September 2021.  MV1 stated that her close friend "Michael" introduced her to CASILLAS. MV1 described CASILLAS to be approximately 50 years of age and Spanish.  MV1 stated that CASILLAS'S wife's name is Jessica and that she had met Jessica one time.  MV1 informed officers that CASILLAS lives on Bay Street in the "projects" and didn't know the number, but that she had been there more than once.  MV1 was then asked by the Springfield Police Detective if the building was the Edmund Wynne Apartments to which she stated "yes."

16.     A query through a database used by law enforcement officers revealed a Carlos Casillas DOB: 07/17/1973 resides at 62 Edmund Wynn Circle Apt D15. A photo from the registry of motor vehicles and an image provided by the Springfield Police Department matched the description of the image used on the Facebook page with the vanity name "Carlos Casillas." Officers and Agents involved in this case know Edmund Wynn Circle is in a housing complex located off Bay Street in Springfield, MA. Furthermore, a Springfield police report relating to another incident lists Carlos CASILLAS DOB: 07/17/1973 as living at the same address (62 Edmund Wynn Circle Apt D15) as Jessica Garcia. Jessica Garcia has a son named Michael Garcia and both Jessica and Michael Garcia reside at 62 Edmund Wynn Circle Apt # D15 with Carlos CASILLAS.

17.     MV1 stated that she had met with CASILLAS up to four times and that the last encounter was sexual.  MV1 stated that the fourth encounter with CASILLAS occurred on September 5, 2021, when CASILLAS picked her and MV2 up in his vehicle outside the group home located at 130 Berkshire St.  She described the vehicle as a blue sedan. A query though the

registry of motor vehicles revealed that Jessica Garcia has a 2021 Blue Toyota Corolla sedan bearing Massachusetts Registration 1GHT99. After CASILLAS picked MV1 and MV2 up, he brought them to a motel. MV1 described the motel as having beige walls and blue doors. She added that the motel was in the proximity of a few gas stations, specifically a Pride Gas Station and that she was positive it was a motel not a hotel. MV1 described the motel as being run down and believed it to be three stories tall. Upon arrival at the motel, MV1 stated that they went to the last room on the first floor but did not recall the room number. While in the room, CASILLAS stated "You wanna see porn? Then wait in the car". MV1 and MV2 then went back to the car and waited for it be "their turn". MV1 stated that she watched multiple women, of all ages enter and leave the motel room.

18.     MV1 stated that she then entered the motel room and had sexual intercourse with CASILLAS. She stated that he penetrated her vagina and her mouth with his penis. MV1 added that CASILLAS "used protection" while having sexual intercourse with CASILLAS (as indicated below, MV1 said in a later forensic interview that CASILLAS did not use protection). She stated that she agreed to have sex with him because her gave her $300.00. MV1 added that CASILLAS agreed to give her a ride to Boston, but that he never did. MV1 stated that she called CASILLAS multiple times after, looking for the ride that they had agreed upon.

19.     MV1 agreed to show Springfield Police Department Officers her Facebook messages with CASILLAS. The messages between CASILLAS and MV1 began on September 1, 2021, at 1:55 PM. Included in the messages were plans for MV1 and CASILLAS to meet up with each other along with several voice calls. In the messages, CASILLAS provided his phone number as 413-693-6505. On September 2, 2021, CASILLAS continued to exchange messages

with MV1.  Included in the conversation were the following messages between MV1 and

CASILLAS:

CASILLAS to MV1: "Baby find a pussy for me I pay $50"

CASILLAS to MV1: "you texting from a phone"

MV1 to CASILLAS: "no a laptop

20.     I believe based on the above messages CASILLAS is offering MV1 $50 for MV1

to find an individual to engage in commercial sex with him.

21.     CASILLAS then entered into the following exchange with MV1:

CASILLAS to MV1: "I just want to see you in a picture"

CASILLAS to MV1: "But I bring you to Boston if we do something first baby.  I'm not playing"

MV1 to CASILLAS: "well what you trying to do"

CASILLAS to MV1: "make you feel nice Baby"

CASILLAS to MV1: "are your horny is baby"

CASILLAS to MV1: "why you horny like me"
CASILLAS to MV1: "what you wanna do when we are going to the room

22.     I believe based on the above conversation CASILLAS is offering MV1

transportation to Boston if MV1 engages in sex with him first and he is asking MV1 what type of

sexual acts will MV1 do once they go to a room.

23.     MV1 was asked by officers with the Springfield Police Department if CASILLAS

was aware of her age and she said yes.  Officers then asked if she had possibly lied to

CASILLAS about her age to which she replied, "I told him I'm 13".  The Staff Member showed

officers messages between CASILLAS and MV1 on the group home's laptop.  The messages

between CASILLAS and MV1 began on September 3, 2021, at 4:58 PM.  Included in the

conversation were attempted meet-up and voice calls between MV1 and CASILLAS.  On

September 4, 20212, at 7:05 AM, MV1 messaged CASILLAS to bring her clothes over.  On September 5, 2021, CASILLAS replied back stating "who's the fuck is this".  MV1 replied stating "This is the fucking girl who gave you pussy tf".  Included in the messages on September 5, 2021, was a text from CASILLAS to MV1 stating, "Give me Pussy" along with a message from MV1 to CASILLAS stating, "can u get us a motel".

24.     On October 13, 2021, HSI Task Force Officer Tara Kelliher (TFO) visited the River Inn Motel in West Springfield, MA.  TFO Kelliher was provided a copy of the room registration card dated time stamped September 3, 2021.  The registration card was filled out by Carlos CASILLAS of 116 Federal Street, Springfield MA.  The date of birth listed on the card was July 17, 1973 which is the same DOB as Carlos CASILLAS from 62 Edmund Wynn Circle. The records revealed the total cost of the room was $90.00 and was paid for in cash.  TFO Kelliher was also provided a copy of CASILLAS's license, which was required to register the room. Additionally, the manager of the Motel stated that he remembered seeing CASILLAS at the hotel.  Below are copies of the registration card and driver's license provided by the motel.



25.     TFO Kelliher visited the room CASILLAS had rented, which was room number

103.  The doors of the room where blue with the interior painted beige, matching the description

provided by MV1.  Below are pictures taken by TFO Kelliher of the room rented by CASILLAS.







26.     Based on the motel records and the timing of the messages between MV1 and
CASILLAS, I believe the sexual encounter between MV1 and CASILLAS occurred on
September 3, 2021 and not September 5, 2021, as reported by MV1.  It appears MV1 was
mistaken about the date, but details about the motel room and its location have been
corroborated.

*ADDITIONAL FACEBOOK MESSAGES*

27.     As mentioned above, on or about October 1, 2021, TFO Kelliher was provided pictures of text message conversations between MV2 and CASILLAS along with text messages between MV2 and MV3 by an attorney assigned through Boston Juvenile Court to represent MV2.  Included in the messages were the following:

**Sunday September 5, 2021, 11:00 PM**

MV2- "*Yo*"
(Two missed audio calls from CASILLAS to MV2)
CASILLAS- "*Hello*"
MV2- "*Can u bring me weed*"
CASILLAS- "*Where are you*"
MV2- "*Chicopee like 10 mins from Rebecca Johnson*"
MV2- "*If u are actually coming I'll send you the addy*"
CASILLAS- "*Who you with*"

**Monday September 6, 2021 (time unknown)**

MV2- "*red hair girl u met before*"
MV2- "*Nay*"
CASILLAS- "*and what you trying to do*"
MV2- "*smoke*"

**Monday September 6, 2021, 8:35 AM**

CASILLAS - "*Yoooo*"
CASILLAS - "*Can you call me*"
CASILLAS – "4136936505"

**Monday September 6, 2021, 8 :37 AM**

(Missed audio call from CASILLAS to MV2)

**Monday September 6, 2021, 10:18 AM**

MV2- "*yo*"

CASILLAS – "*Hello*"

MV2- "*You got weed*"

**Monday September 6, 2021, 1:29 PM- MV2 to CASILLAS**

MV2- *"Yo"*

**Monday September 6, 2021, 2:16 PM-MV2 to CASILLAS**

MV2- *"Yo, U got weed"*

**Monday September 6, 2021, 4:05 PM**

MV2- "*Yo*"

**Monday September 6, 2021, 7:04 PM Attempted audio call from MV2 followed by the following texts to CASILLAS**

MV2 - "Yo"

MV2- "*Yo*"

MV2- "*Yo*"

MV2- "*Can you get us a motel we have the money*"

"*please*"

**Tuesday September 7, 2021, 11:04 AM- MV3 texts to MV2**

MV3 - "*Yo*"

MV3- "*Char I need your ass nowwww*!!!!!!!"

MV3 "*I need to leave today, Plsssssss*"

MV2- "*Ight hold on I'm bouta call u*"

MV2 "*Stay active*"

**Tuesday September 21, 2021**

CASILLAS- (image of a dog "I love you") sent to MV2

**Tuesday September 21, 2021, 12:53 PM**

MV2- "*Yo*"

MV2- "*Come get us*"

CASILLAS- "*You got to wait a little while*"

MV2- "*Okay"*

**Tuesday September 21, 2021, 1:38 PM**

MV2- "*What time*"

CASILLAS- "*I let you know*"

**Tuesday September 21, 2021, 2:16 PM**

MV2- "*igh*t"

**Tuesday September 21, 2021,** 4**:54 PM**

CASILLAS- "*Yooo*"

CASILLAS- "*I need your real number*"

CASILLAS- "*Yooo*"

CASILLAS- "You *gotta talk to me or not*"

**Tuesday September 21, 2021, 5:31 PM**

MV2 – "*Yea*"

MV2- "*413-251-5468*"

**Tuesday September 21, 2021, 7:37 PM**

**MV2**- "*Come get us*"

**Tuesday September 21, 2021, 9:00 PM CASILLAS**

CASILLAS- "*Do you want me to pick you up or not*"

CASILLAS- "*my boy would like to chill with you and your sister baby*"

CASILLAS- "*Let me know*"

CASILLAS- "*To go and get you right now baby*"

CASILLAS- "*Yoooo*"

**-September 22, 2021, 3:32 AM**

MV2- "*Sorry*"

MV2- "*Let's do it today*"

MV2- "*A lot happened yesterday*"

CASILLAS- "*We. Was waiting for you guys All day baby*"

**September 22, 2021, 7:59 AM**

MV2- "*I wasn't home yesterday*"

MV2- "*We went somewhere with my aunt*"

**Monday (date unknown)**

CASILLAS- "*Tell you sister to stay with me waiting for you*"

CASILLAS- "*Hello, yes, no what*"

**Monday 1:42 PM (date unknown)**

MV2- "*we're both in the car*"

MV2- "*Bouta go back to the house*"

MV2- "*I'll text u when I'm there*"

**Monday 2:15 PM (date unknown)**

CASILLAS- "*Let me know*"

**Monday 2:59 PM (date unknown)**

MV2- "*Come now*"

MV2- "*Yo, Yo, Yo"*

(Audio call from CASILLAS)

MV2- "*idk wha u said*"

CASILLAS- "*I am going to the car right now I'm be there in like 10 minutes baby"*

MV2- "*okay text me when your outside I'll come out*"

CASILLAS- "*And I said send me a picture from her but the all body baby"*

**Monday 3:55 PM (date unknown)**

CASILLAS- "*What happened*"

(Missed audio call)

CASILLAS- "*Yoooo, call me, yooo, hello*"

**Monday 3:58 PM (date unknown)**

(Missed audio call)

CASILLAS- "*come on*"

CASILLAS- "*I don't getting or this*"

CASILLAS- "*Can you call me or not*"

MV2 (missed audio call)

MV2- "*Yo*"

MV2- "*Are you coming*"

MV2- "*We're outside waiting*"

MV2- *"Lmk"*

MV2- "*Hello*"

**Monday 4:15 PM (date unknown)**

MV2- (missed audio call)

**Monday 4:17 PM (date unknown)**

MV2 (audio call 50 seconds)

**Monday 4:48 PM (date unknown)**

CASILLAS- (audio call 17 seconds)

**(Unknown date and time)**

MV2- Sends image of female with red hair in tank top

CASILLAS- "*That's the girl who came with flaca*"

MV2- "*Yea*"

CASILLAS- "*ohh shit*

CASILLAS- "*my girlfriend*"

**Monday (date and time unknown)**

MV2- *"I'm outside*"

CASILLAS- (missed audio call)

MV2- "*16 Charles St*"

CASILLAS- "I *don't see you*"

**Monday 9:26 PM (date unknown)**

MV2- *"Are you coming"*

**Tuesday 3:14 AM (date unknown)**

CASILLAS- "*Love you a lot baby*"

**Tuesday 7:41 AM (date unknown)**

CASILLAS sends picture to MV2 stating "your love makes me happy"

**(Unknown date and time)**

MV2- "*well we can talk abt what else in the car*"

CASILLAS- *"I need some love"*

CASILLAS- "*Where my baby at*"

MV2- "*Habana?*"

MV2- "*idk where she at*"

CASILLAS- "*Yes, Ohh, You coming by yourself*"

MV2- *"yea*"

MV2- *"No I'm wit my other sis"*

MV2 send image of female face

CASILLAS- "*Hello*"

MV2- *17 Charles Street, Chicopee, u coming?"*

CASILLAS- "*and what you trying to do*"

MV2- *"smoke"*

CASILLAS- "*that's it*"

CASILLAS sends three laughing emojis

MV2- *"Her, she's coming with me"*

CASILLAS- *"oko, she is so beautiful"*

MV2- *"Yea thank"*

MV2- *"So are you coming with the weed we r trying to smoke"*

CASILLAS- *" Yeah"*

MV2- *"When?"*

CASILLAS- *"Are you ready now"*

MV2- *"I'm boutta go out rq when I come back ima be ready, ok"*

CASILLAS- *"What you mean"*

MV2- *"I gotta go run a couple of errands and then I'll text u when I'm back ok?"*

CASILLAS- *"Come on, I was on my way, Hello"*

CASILLAS sends an image of a small amount of marijuana in the hand of a male inside a vehicle

MV2- *"Can u jus stay in front of the house bc I have to go somewhere, so we can still smoke still, So still come"*

CASILLAS- *"How long you gotta take it, you know how I am, no bullshit"*

MV2- *"no when u come we're gonna come out and smoke"*

MV2- *"Then go back in the house cuz I gotta go wit my aunt after"*

CASILLAS- *"But you gotta jump to my car and driving around"*

MV2- *"Okay can my friend drive the girl, she knows how to drive"*

CASILLAS- *"the girl from the picture baby"*

MV2- *"Yea, can she?"*

CASILLAS- *"if its her yeah"*

MV2- *"Okay when u comin?*

CASILLAS- *"I love her"*

MV2- *"ok, you comin?"*

CASILLAS- *"Now"*

MV2- *"Text me when ur in front of the house"*

CASILLAS- *"Not, I'm gotta do before Because I don't want to wait"*

MV2- *"What?*

CASILLAS- *"im gotta text you when I be close"*

MV2- *"ok"*

**Monday 11:26 AM (date unknown)**

MV2- "*u close ??, u gotta come now or I gotta go wit my aunt*"

CASILLAS- "*Don't go, wait for me*"

MV2- *"Well are u almost here"*

MV2- "*Igh u gottta be here in like the next 10 mins*"

CASILLAS- "*I'm just getting work, I got it make money*"

CASILLAS- "*Hello*"

MV2- *"When r u gonna be here tho?"*

MV2- (Audio call)

MV2- *"how long, Bc we got dressed n ready bc u jus said u was coming"*

CASILLAS- "*I/m gotta drive right now*"

MV2- "*aight we'll we're coming back she's jus going to the store*"

MV2- "*We'll be back in like 45 mins*"

CASILLAS- *"yo! I'm ready driving"*

MV2- "*Alr give me like 20 mins n I'll be there*"

CASILLAS- "*The GPS said 5 minutes*"

MV2- "*Ok but I'm m me n my sis we we'll be back at the house in 20 min, Ok?*"

CASILLAS- "*Really*"

MV2- "*Yes*"

CASILLAS- *"You let me get this for nothing"*

MV2- "*We can still meet up I'll text u when I'm back at my house bc we're not far*"

CASILLAS- *"Yoo"*

MV2- *"wha"*

CASILLAS- *"I'm telling you I'm gotta be there in 5 minutes"*

MV2- *"Ok"*

CASILLAS- *"Ok what"*

MV2- *"We gonna be there in 20 minutes"*

CASILLAS- *"Forget it"*

28.     On or about October 6, 2021, a Department of Homeland Security Summons was sent to T-Mobile US, Inc. for the number (413) 693-6505 ("TARGET PHONE 1"), which is the number CASILLAS provided to MV2 over text message.   On or about October 12, 2021, T-Mobile US, Inc. responded to the request.  Subscriber information states the phone is registered to Jessica GARCIA ("GARCIA") of 62 Edmund Wynne Circle, #D15, Springfield, MA.  GARCIA is known by law enforcement to be the girlfriend/wife of CASILLAS.

29.     Included in the call records associated with TARGET PHONE 1 were calls with the following people/businesses:

- MV2 (13 times between 09/21/2021- 09/22/2021)

- River In Motel West Springfield (11 times on 09/03/2021)

- Red Roof Plus West Springfield (1 time on 08/24/2021)

- Econo Lodge West Springfield (1 time on 08/24/2021)

- Red Carpet Inn West Springfield (1 time on 8/24/2021)

- Marriot International, Inc Agawam (1 time on 8/24/2021)

30.     I know through my training and experience and that of other agents in this investigation, it is common for those involved in sex trafficking to frequent hotels and motels. Pimps or sex buyers often use motels/hotels rather than their own residence to avoid detection from law enforcement and to also maintain a level of discretion for all parties involved. Furthermore, I know through my training and experience and that of other agents that is common for individuals with extensive criminal history and who continue to be involved in illicit activity to activate cell phones under a different name for the purpose of evading law enforcement detection.  CASILLAS's use of a phone number registered under the name of a different person is consistent with the practices of those involved in sex trafficking.

### INTERVIEW OF MINOR VICTIM 1

31.     On September 22, 2021, a forensic interview was conducted of MV1 by the

Springfield Police Department.  In the interview, MV1 stated that she has a friend named

"Michael" whose stepdad is "Carlos" (Carlos CASILLAS).  MV1 stated that she "hit up"

CASILLAS on Facebook.  MV1 stated that initially she looked at CASILLAS as a dad, but that

people in the projects were telling her that he was a "pervert" and that he "will do stuff with

you".  MV1 stated that he asked CASILLAS to come pick her up.  CASILLAS picked her and

MV2 up from the program in a blue Honda.  First, CASILLAS took them to Dollar Tree, then

after Dollar Tree, he took them to a store to get clothes for her and MV2.  MV1 stated that

CASILLAS gave them cash to purchase the clothes at the store.  After they left the store,

CASILLAS brought them to a hotel where CASILLAS dropped them off.  MV1 stated that MV2

wanted to get her hair done, so CASILLAS left to buy a weave for MV2.  MV1 added that at the

hotel, CASILLAS told her that he had feelings for her.

32.     MV1 stated that after CASILLAS returned to the hotel, her and MV2 got into the

car with him, and then dropped them off at a pizza place.  MV1 stated that while CASILLAS

was gone, MV1 and MV2 were talking to him on the phone.  MV1 stated that CASILLAS was

asking if they could find a woman for him to "do stuff with" and that he would pay 50 dollars.

MV1 added that MV2 told her that if CASILLAS gives them a ride to Boston that she should "do

it" (referencing have sex with CASILLAS).  MV2 then messaged CASILLAS on her phone

stating that MV1 would "do it". After approximately three hours, CASILLAS returned to the

pizza place to pick up MV1 and MV2.  MV1 stated that CASILLAS apologized for leaving them

there.  MV1 stated that he was gone selling drugs like "cocaine" and "pills".  MV1 asked

CASILLAS how to make crack, so that she could sell it and make a lot of money.  CASILLAS told them "to take a spoon and a lighter and then put the cocaine on it".

33.     After CASILLAS, picked MV1 and MV2 at the pizza place, he brought them to the McDonalds near the Rebecca Johnson School. MV1 stated that after CASILLAS dropped them off at McDonalds, he left because he had a "family emergency".  After approximately two hours, CASILLAS picked them up and brought them back to the same hotel.  MV1 stated that the hotel room had a queen size bed with a "yellow, brown and white" covers and a blue door. MV1 added that there was no lobby and that you enter from the outside.

34.     Upon their arrival at the hotel, MV1 stated that CASILLAS gave MV2 a bag of weed "to roll".  MV1 stated that she was high and drunk from alcohol that CASILLAS bought them. MV1 also stated that she had twenty-four "Triple Cs"[1] that they had bought at the store. At this point, MV1 clarified that she was in fact at a motel not a hotel.  MV1 stated that her and CASILLAS were laying on the bed when CASILLAS asked her if she had lost her virginity and that "afterwards it just got crazy".

35.     MV1 stated that she told CASILLAS she didn't want to do it (referencing having sex with CASILLAS), but if she had to do it to go to Boston she would.  MV1 added that she was also texting MV2 asking if she should do it and that MV2 told her if that if CASILLAS would bring them to Boston that she should do it.  MV1 then stated that she "had sex with him" and that his penis went into her vagina. MV1 added that prior to them having sex, CASILLAS stated that they had made a "deal" and that he had given her $1,500.  MV1 stated that

---

[1] Triple C is a name for Coricidin Cough & Cold and is a medication sold as a cough suppressant.

CASILLAS didn't use any protection and that it lasted 25 minutes.  After, they had sex, MV1 stated that she went to the bathroom and took a shower.

36.     After MV1 returned from the bathroom, she stated that there were several "crackheads" in the room and that CASILLAS had left, stating that he would be "right back". When CASILLAS returned, MV1 stated that he had "an issue" with her and MV2 because someone had texted CASILLAS's wife stating that one of the girls CASILLAS was sleeping with was 13.  MV1 added that CASILLAS's wife knew her because that is "Michael's mom" and that she was texting CASILLAS asking, "why are you sleeping with a 13-year-old?" and that "he was nasty".

37.     MV1 stated that while she was having sex with CASILLAS, she was laying on the bed while CASILLAS was standing up.  MV1 stated that he didn't know how old CASILLAS was, but that he looked 50.  MV1 added that CASILLAS had brown hair, he was chubby, had "messed up" teeth, light skinned, had facial hair, and was short, but not shorter than her.  MV1 continued to say that CASILLAS was "sick" and asked, "why would you want to do that to a 13-year-old?".

38.     MV1 stated that she didn't know exactly where CASILLAS lived, but that he lived in "the projects" in Springfield with her friend Michael.  MV1 stated that she didn't know when the incident with CASILLAS happened, but that it was two or three weeks ago and that after CASILLAS left them at the motel, MV1 and MV2 got kicked out because their time was up.  After they were kicked out, MV1 stated she started sleeping in "basements" in the projects along with restaurant bathrooms.

39.     MV1 stated that CASILLAS knew how old she was because "he knew that" through her friend "Michael," who was 16.  MV1 added that she met CASILLAS three times,

but that she knows "Michael's" mom.  MV1 stated that when she saw CASILLAS the other times, he would "touch up on me".  MV1 stated that then when she ran away previously with MV3, they had seen CASILLAS, and that he was "slapping his hand on my thigh" and "touching my butt". MV1 stated that when CASILLAS was touching her, he was also touching MV3. During the same time, MV1 stated that CASILLAS gave MV3 cocaine, which MV3 took.  After MV3 took the cocaine, CASILLAS "kissed her" and "she sucked his dick".  MV1 stated that this all took place in his car, which she said was a Honda, while parked at "Blunt Park".

40.     I know from my training and experience and that of other officers and agents involved in this investigation that sex traffickers/pimps often prey on young women or children who are "runaways" because they are more vulnerable than adults. These individuals have usually experienced abuse or some type of extreme conflict in their previous homes and may be naïve and easy to manipulate and influence. Furthermore, they may be desperate for love and attention and also for basic needs such as food and shelter, which makes them especially vulnerable to being trafficked or to engage in commercial sex.

*TOLL ANALYSIS OF CELLULAR NUMBER 413-693-6505 ASSOCIATED WITH CARLOS CASILLAS*

41.     Our investigation has revealed that Carlos CASILLA is in possession and utilizes a cellular phone with the identified number 413-693-6505. During the investigation as previously stated above investigators requested a summons from T-Mobile for the phone records for 413-693-6505. Data from the return revealed the subscriber/billing information is Jessica Garcia, 62 Edmund Wynne Circle D#15 Springfield, MA. The line was activated on June 16, 2021, and there was a total of 13,235 communications with 1,059 contact numbers during the time frame of June 30, 2021, and October 7, 2021.

42.     Data from the return revealed that Carlos CASILLAS has been utilizing cellular number 413-693-6505 to communicate with a known prostitute, and individuals previously charged with sex offenses and narcotics offenses.

43.     **Ashely Johnson (DOB: 04/12/1987)** Data revealed number 413-693-6505 has been communicating with cellular number 413-221-6483. A query completed through a database used by law enforcement revealed Ashley Johnson has posted commercial sex advertisements on web sites known to investigators involved in the investigation that are used for commercial sex. Johnson has numerous open charges to include possession of Class B (cocaine), Carrying a dangerous weapon, Larceny by check and several motor vehicle violations.

44.     **Juan Torres (DOB: 02/19/1979)** Data revealed number 413-693-6505 has been communicating with cellular number 413-326-7227. A query completed through a database used by law enforcement revealed Torres has a criminal history to include possession and distribution of Class B (cocaine), numerous larceny charges, assault and battery and abuse prevention act violations. The national Crime Information Center (NCIC) list Torres as a potential predator.

45.     **Richard Libiszewski (DOB: 10/27/1948)** Data revealed number 413-693-6505 has been communicating with cellular number 413-364-3784. A query completed through a database used by law enforcement revealed Libiszewski has a criminal history to include several restraining orders, indecent A&B on a child, open and gross and several assault and battery charges.

46.     **Hiram Martinez (DOB: 12/17/1984)** Data revealed number 413-693-6505 has been communicating with cellular number 413-507-5020. A query completed through a database used by law enforcement revealed Martinez has a criminal history to include trafficking a

controlled substance Class B (cocaine) and criminal charges in New York of promoting prostitution and public lewdness.

47.     **Germaine Wray (DOB: 02/20/1978)** Data revealed number 413-693-6505 has been communicating with cellular number 413-657-7921. A query through a database used by law enforcement revealed Wray has a criminal history of firearms, assault and battery, indecent assault and battery, numerous restraining orders and currently has a felony straight warrant out of Hampden Superior Court for aggravated assault with a dangerous weapon.

### *FACEBOOK INFORMATION CARLOS CASILLAS*

48.     Publicly available information on Facebook indicates that CASILLAS has a Facebook with user ID: 100024593259380, Screen/User Name:  Carlos Casillas ("Subject Facebook Account"), Profile URL:  https://www.facebook.com/people/Carlos-Casillas/100024593259380/. As mentioned above the image posted on the Subject Facebook Account has been identified as Carlos CASILLAS based on his RMV photo and the photo provided by the Springfield Police during booking. A review of his public Facebook account revealed among his Facebook friends are females who are known prostitutes, pimps and addicts.

49.     The following individuals are Facebook Friends with the Subject Facebook Account and investigators involved in this investigation know that these individual either engage or have engaged in commercial sex or have been targets of past investigations of human trafficking in the Western Massachusetts area.  Jessica Picket, Stephanie Peluso, Malcom Burris, Chelsea Lynn Brenton, Renee Dagenais, Desray King and Sara Bowers.

### *SURVEILLANCE OF TARGET LOCATION*

50.     On October 12, 2021, TFO Tara Kelliher conducted surveillance in the area of 62 Edmund Wynne Circle, the residence of Carlos CASILLAS. TFO Kelliher observed the blue

2021 Toyota Corolla Massachusetts Registration 1GHT99 parked in the vicinity of 62 Edmund Wynne Circle.

51.     On October 20, 2021, TFO Tara Kelliher and I conducted surveillance in the area of 62 Edmund Wynne Circle, the residence of Carlos CASIILAS. Both vehicles, the 2003 Gray Hyundai Elantra and the Blue Toyota Corolla Sedan registered to Jessica Garcia, the wife/girlfriend of CASILLAS were parked in the vicinity of 62 Edmund Street.

52.     On October 22, 2021, TFO Tara Kelliher and TFO Rumual Silva from the Hampden County Sheriff's Department conducted surveillance in the area of 62 Edmund Wynne Circle. TFO Silva observed the blue Toyota Sedan registered to Jessica Garcia parked across from the Subject Premises. Approximately an hour later TFO Kelliher observed CASILLAS exit his residence carrying a white plastic bag that contained an item or items that appeared to be heavy due to the positioning of the bag. TFO Kelliher observed CASILLAS enter the driver's side of the Toyota and drive off towards Bay Street. TFO Silva followed the vehicle and observed the vehicle pull over onto Bowles Street.  A young Hispanic male approached the driver's side of the vehicle and eventually got into the passenger side. TFO Silva observed the vehicle with both CASILLAS and the unidentified male drive to Bergin Circle which is right around the corner from Bowles Street. The unidentified male exited the vehicle and CASILLAS remained in the parking lot in front of Bergin Circle for approximately ten minutes.  Based on my training and experience and that of other investigators involved in this investigation that behavior is consistent with street level narcotics distribution sales.  Eventually CASILLAS pulled out and drove down Bay Street towards downtown Springfield. Around the same time TFO Kelliher observed the unidentified male that was picked up on Bowles Street walking down

Bay Street with a young unidentified light skinned heavy set female with dyed blue hair.  The female was carrying a small black plastic bag and the male was carrying a pink plastic bag.

53.     Based on the above surveillance, the toll review of the cellular phone being utilized by CASILLAS, his criminal history, the statement provided by MV1 that he was out selling pills and or cocaine that day at the motel and that CASILLAS provided cocaine to MV3 in exchange for oral sex and  the communication from the Facebook Message from CASILLAS to MV2 "*I'm just getting work, I got it make money"* I believe CASILLAS is also selling narcotics. Investigators involved in this investigation have had past investigations involving wire taps. During numerous calls that were intercepted during these investigations narcotics dealers often used the word "work" when referring to narcotics. These investigations resulted in numerous seizures of trafficking weight in both cocaine and heroin.

### SPRINGFIELD POLICE REPORT STOLEN MOTOR VEHICLE

54.     On September 6, 2021, Officers from the Springfield Police Department were dispatched to 11 Tapley Street in Springfield, MA for a stolen motor vehicle. Upon arrival, officers were met with the registered owner of a white 2015 Honda Accord bearing MA registration (9WX474). The owner of the stolen vehicle told Officers he left his car idling while he ran into the store quickly. He then saw what appeared to be several teenagers driving away in his vehicle. The Irving staff were able to play a video of the event.

55.     In the store surveillance video, there are four individuals waiting in the store. They told staff they were waiting for their ride which was coming from the Boston, MA area. The vehicle is seen on camera pulling into the parking space located directly in front of the store entrance. The owner of the vehicle is then seen entering the store and as he makes his way down

one of the aisles, the four teenagers run out of the store, jump in the car and drive off in the vehicle.

56.     While on scene watching the store surveillance video, officers were notified by one of the staff that one of the females involved was in the store. Officers made their way to the front of the store and were unable to locate the suspect. Officers made their way outside to the Dunkin Donuts drive through and encountered the three females they observed on the store's footage. Officers identified the three females as MV1, MV2 and Ms. Brittany Johnson. They told Officers they met up with this kid named Michael (unknown last name), to smoke earlier in the day. Ms. Johnson met Michael on a Facebook account with the vanity name "Mikey XG". The four of them were hanging out at the store waiting for a ride when Michael asked them "Do you guys just want to steal a car?". The three girls agreed and followed Michael into white Honda and took off.

57.     Ms. Johnson stated that she realized after they left in the stolen vehicle, that she had left her phone behind at the store. She told Michael to take her back to the store to retrieve the phone. Michael told her that he was not going to take her back to the store. Ms. Johnson then told Michael that if he did not take her back to get her phone that she would call the police herself. Michael then dropped off MV1, MV2 and Ms. Johnson off somewhere off camera behind the convenience store. That is when MV1 is seen entering the store to ask for the phone.

58.     Ms. Johnson advised officers that she last saw Michael in the stolen vehicle, traveling westerly out of the parking lot against traffic on Saint James Avenue. She further stated that she then saw him take a right shortly up the road.  Officers were able to recover the stolen vehicle at 530 Saint James Avenue. The vehicle unoccupied and idling.

59.     MV2 reported to police that Michael resides at 571 Bay St. in Springfield, MA. Springfield Police discovered MV1 and MV2 were reported as runaways from the group home at 130 Berkshire in Springfield, MA.  MV1 and MV2 were both transported to 130 Berkshire Ave in Springfield, MA.

60.     Officers and Agents involved in this investigation know that CASILLAS has a stepson named Michael Garcia who according to a database used by law enforcement officers resides at 62 Edmund Wynne Circle along with his mother Jessica Garcia. Furthermore, investigators know that Michael Garcia is associated with a Facebook account with the vanity name "Mikey XG".

61.     On October 12, 2021, TFO Tara Kelliher met with a staff member who works at the Greylock located at 103 Berkshire Avenue. The staff member indicated MV1 and MV2 have been picked up by Michael in the past from the group home and indicated Michael may have introduced MV1 and MV2 to his Stepfather Carlos CASILLAS.

### FACEBOOK, INC.

62.     In my training and experience, I have learned that Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

63.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

64.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

65.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

66.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

67.     Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

68.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

69.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

70.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

71.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

72.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

73.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

74.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

75.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

76.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

77.     Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

78.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

79.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

80.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

81.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

82.     I believe the Subject Account, as well as the accompanying Facebook messenger services, will contain information relevant to my ongoing investigation.  Facebook accounts and Facebook messenger are often, if not typically, used by the user on his/her handset device.  Many of the photographs in the prostitution advertisements described in this affidavit appear to be "selfies," i.e., pictures taken of one self, which are taken almost invariably with smartphones. Most of the popular Facebook features are geared toward mobile devices, such as the posting of pictures to one's account.  A photograph can be taken with a smartphone, and the Facebook software allows the photograph to be posted easily, and almost instantaneously, to the user's Facebook account.  This capability, along with the ease with which smartphones are used, allows users to give their friends a running narrative of their everyday lives with a combination of words and pictures.

83.     Facebook accounts are tied to the Facebook messenger service.  Facebook messenger is a service that a Facebook account holder may, or may not, choose to add to the user's Facebook capability.  On a mobile device, the Facebook account and Facebook messenger are separate applications and are separate icons on the screen of the mobile device.  However, they are connected, with the existence of Facebook messenger messages shown on the Facebook account, even though the user must go to the separate Facebook messenger application on the mobile device to retrieve the messages.  On a traditional computer, a Facebook account can be accessed through an internet browser, like Google Chrome.  On such a computer, the accompanying Facebook messenger service is also tied to the Facebook account.  In fact, the Facebook messenger messages can be accessed directly from the Facebook account, rather than the user needing to launch a separate application to retrieve the Facebook messenger messages.

84.     Information from the Subject Accounts is likely to contain evidence of the everyday activities of the users of the Subject Facebook Accounts, including their locations at various dates and times.  The Facebook messenger messages are also likely to contain information about the Facebook users' everyday activities.  Information from the Subject Facebook Accounts and from the Facebook messenger messages will help to further establish the identity of the persons operating the Subject Accounts and further establish the nature of their communications regarding child pornography and child sexual exploitation activities. Information added to one of the Subject Accounts at any time since the account's inception that tends to identify the user or operator of the account is pertinent to the investigation, therefore, data associated with any of the Subject Accounts constitutes evidence in this matter regardless of when it was created and/or uploaded to the Subject Account.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED REGARDING SUBJECT FACEBOOK ACCOUNTS

85.     I anticipate executing this warrant for the Subject Accounts under the Electronic

Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of

the records and other information (including the content of communications) particularly

described in Section I of Attachment B3.  Upon receipt of the information described in Section I

of Attachment B3, government-authorized persons will review that information to locate the

items described in Section II of Attachment B3.

### *FACEBOOK LEGAL AUTHORITY*

86.     The government may obtain both electronic communications and subscriber

information from a provider of electronic communication service by obtaining a search warrant.

18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

87.     Any court with jurisdiction over the offense under investigation may issue a

search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting

company or email provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A).

Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be

present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

88.     If the government obtains a search warrant, there is no requirement that either the

government or the provider give notice to the subscriber.  18 U.S.C. §§ 2703(b)(1)(A),

2703(c)(3).

89.     This application seeks a warrant to search all responsive records and information

under the control of Facebook, a provider subject to the jurisdiction of this court, regardless of

where Facebook has chosen to store such information. The government intends to require the

disclosure pursuant to the requested warrant of the contents of wire or electronic

communications and any records or other information pertaining to the customers or subscribers

if such communication, record, or other information is within Facebook's possession, custody, or

control, regardless of whether such communication, record, or other information is stored, held,

or maintained outside the United States.

### *REQUEST TO SEAL AND PRECLUDE NOTICE TO THE FACEBOOK SUBSCRIBER*

90.     I request that this application, the warrant, the order, and any related papers be

sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

91.     I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C.

§ 2705(b), the Court order Facebook not to notify any person (including the subscriber to whom

the materials relate) of the existence of this application, the warrant, the Court's Order, any

related papers, or the execution of the warrant unless and until authorized to do so by the Court.

Non-disclosure is appropriate in this case because the application, the warrant, the Court's Order,

and related papers relate to an ongoing criminal investigation that is neither public nor known to

all of the targets of the investigation, and its disclosure may alert the targets to the existence of

the investigation.  There is accordingly reason to believe that notification of the existence of the

application, the warrant, the Order, and/or related papers will seriously jeopardize the

investigation, including by:  giving targets an opportunity to flee, destroy or tamper with

evidence, and/or change patterns of behavior.  See 18 U.S.C. § 2705(b).  Moreover, some of the

evidence in this investigation is stored electronically.  If alerted to the existence of the

application, the warrant, the Order, and/or related papers, the target(s) could destroy

evidence, including information saved to personal computers, on other electronic media, or in

social media accounts.

### *INTERSTATE NEXUS*

92.     Facebook is both a national and global social medial platform with serves situated

throughout the United States, and it operates over the internet, a facility of interstate commerce.

CASILLAS has used Facebook as a means to promote the trafficking of his victims.

93. Additionally, the messages between CASILLAS and the Minor Victims are conducted using electronic devices, including but not limited to cellular telephones and computers.

94. The Subject Facebook Account is likely to lead to information that will identify other victims of Subject Offenses and will give information about how CASILLAS recruits and maintains contact with his victims. The messages are also likely to contain information that would help to identify currently unidentified victims. The text messages are likely to contain communications between CASILLAS and victims as well as communications regarding these victims and any methods used by CASILLAS to coerce and control them.

95. I, and other agents and officers involved in this investigation, know based on training and experience, that mobile phones are capable of storing the historic call log (outgoing/incoming/missed) as well as past messages (sent/received/draft) on the device. I also know that people often communicate via text message, email, picture mail. Instant messages and other internet communication sites using their mobile phones. Depending on the mobile phone and the frequency of such messaging those messages may be stored on the device for periods of time until they are overwritten. I also know that mobile phones have the capability of accessing the internet and previous internet searches can be accessed. I also know that it is possible to ascertain information/files even after they have been overwritten or deleted from a mobile phone.

96. I, and other agents and officers involved in this investigation, also have personal knowledge, based upon training and experience, that mobile devices have capabilities that will hold evidence that will aid in establishing the identity of perpetrators(s), the circumstances under

which the crime was committed, and/or which in general will assist in the discovery of the pertinent facts.  Additionally, I know that communications are often sent to mobile devices by people, known and unknown to law enforcement, who had prior knowledge of the suspects' plan to commit a crime, including the illegal trafficking of humans.  I also know that the retrieval of such evidence requires a systematic search in order to locate, seize, record, photograph and process the information.

### *SEIZURE OF COMPUTER EQUIPMENT AND DATA*

97.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.  I am also aware that the Consumer Electronics Association estimated that in 2010, 86 percent of all U.S. households owned at least one computer.

98.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Additionally, I know from my knowledge, training, experience and information

provide to me by other agents, that individuals who use smartphones in furtherance of a crime, almost always carry the device on their person, to include bringing into their place of residence.

99.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

100.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.    The volume of evidence ─ storage media such as hard disks, flash drives, CD-ROMs, and DVD-ROMs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.    Technical requirements ─ analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the

system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password-protected, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

101.    Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

102.    The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how their contents or ownership appear or are described by others at the scene of the search.

### *FOURTEEN-DAY RULE FOR EXECUTION OF FACEBOOK WARRANT*

103.    Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues this warrant, the United States will execute it not by entering the premises of Facebook as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data.  This practice is approved in 18

U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

104.     Based on my training and experience and that of other law enforcement, I understand that electronic communications providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that email providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

105.     The United States does not ask for this extra data or to participate in its production.

106.     Should Facebook produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Facebook, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as email, absent a follow-up warrant.

107.     For these reasons, I request that the Court approve the procedures in Attachment B3 which set forth these limitations.

### *UNLOCKING A DEVICE USING BIOMETRIC FEATURES*

108.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other

manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

109.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

110.     The passcode that would unlock the Apple device(s) found during the search of the Subject Premises/Subject Person is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the Apple device(s) found during the search of the Subject Premises/Subject Person to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

111.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

112.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises/and the Subject Person to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

113.    Based on the information described above, I have probable cause to believe that Carlos CASILLAS committed the Subject Offenses and that evidence, fruits, and instrumentalities of the Subject Offenses will be found at the Subject Premises, the Subject Person, and the Subject Facebook Account.

114.    The procedures for copying and reviewing the relevant records from Facebook are set out in Attachment B3 to the search warrant.

Respectfully submitted,


  /s/ Marshall McGuerty                    Signed electronically with authorization from
——————————————————                        HSI Special Agent Marshall McGuerty on October 28, 2021.
MARSHALL MCGUERTY
Special Agent
United States Department of Homeland Security, Homeland Security Investigations



Subscribed and sworn to before me on OCTOBER 28, 2021


 /s/ Katherine A. Robertson
——————————————————————————————
KATHERINE A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE

Signed electronically with authorization from
Katherine A. Robertson, U.S. Magistrate Judge on October 28, 2021.



Certified to be a true and
correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: Melissa M. Rivera
—————————————————
        Deputy Clerk

Date: 10/28/2021
—————————————————

**ATTACHMENT A-1:**

**DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The premises to be searched are located at 62 Edmund Wynn Circle #D15, Springfield, MA,

01109, including any safes, sheds, garages, and other structures within and/or on the premises

and 2021 Blue Toyota Corolla, Massachusetts Registration 1GHT99. The building 62 Edmund

Wynn Circle D, Springfield, MA, is a white gray, two-story, residence with white trim and the

number 62 clearly marked on the front side above the door. The building is the last unit on the

left-hand side.

**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

I.       All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of Sex Trafficking of Children in violation of 18 U.S.C. § 1591(a); Use of Facility of Interstate Commerce to Entice Individual to Engage in Prostitution in violation of 18 U.S.C. § 2422(b); Use of Facility of Interstate Commerce to Promote Unlawful Activity in violation of 18 U.S.C. § 1952(a) and 18 U.S.C. § 1952(b), including:

A.       Records and tangible objects pertaining to the following people, entities, physical addresses, telephone numbers, bank accounts, financial records, websites, e-mail addresses, and IP addresses:

1.       Carlos CASILLAS

B.       Communications, books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances.

C.       Communications, books, records, receipts, notes, ledgers, and other documents relating to prostitution.

D.       Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example:  money orders, wire transfers, cashier checks and receipts, bank statements, passbooks, checkbooks, and check registers.

E.       Documents indicating travel in interstate and foreign commerce, to include: airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel and car rental statements; correspondence with travel agencies and other travel-related businesses, airline, rent-a-car, and hotel frequent flier or user cards and statements, passports and visas.

F.      Firearms, ammunition, stun guns, knives and any other types of dangerous weapons. It may also be necessary to search under floorboards, inside wall panels and behind molding as it has been our experience that the drugs may be hidden in these areas.

G.      For any computer hardware, computer software, computer related documentation, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.      evidence of who used, owned, or controlled the computer equipment;

2.      evidence of computer software that would allow others to control the items, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

3.      evidence of the attachment of other computer hardware or storage media;

4.      evidence of counter forensic programs and associated data that are designed to eliminate data;

5.      evidence of the times the computer equipment was used;

6.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media; and

H.      Records and tangible objects relating to the ownership, occupancy, or use

of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

I.      Items of personal property that tend to identify the person in the residence, occupancy, control, or ownership of the premise that is the subject of this warrant.

J.      Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above.

II.     All computer hardware, computer software, computer-related documentation, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the Subject Premises described in Attachment A-1, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Subject Premises to the sensor of the subject device and/or to hold the device in front of their faces.

## DEFINITIONS

For the purpose of this warrant:

A.      "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

B.      "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cellular telephone, or wireless communication device); any peripheral input/output device (such as a

keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.   "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.   "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.   "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

F.   "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.   "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain

contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

## ATTACHMENT A-2

The premises to be searched are the person of Carlos CASILLAS and whatever vehicle he is currently operating.



## ATTACHMENT B-2

## ITEMS TO BE SEIZED

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of Sex Trafficking of Children in violation of 18 U.S.C. § 1591(a); Use of Facility of Interstate Commerce to Entice Individual to Engage in Prostitution in violation of 18 U.S.C. § 2422(b); Use of Facility of Interstate Commerce to Promote Unlawful Activity in violation of 18 U.S.C. § 1952(a) and 18 U.S.C. § 1952(b), including:

A.      Records and tangible objects pertaining to the following people, entities, physical addresses, telephone numbers, bank accounts, financial records, websites, e-mail addresses, and IP addresses:

1.      Carlos CASILLAS

B.      Communications, books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances.

C.      Communications, books, records, receipts, notes, ledgers, and other documents relating to prostitution.

D.      Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example:  money orders, wire transfers, cashier checks and receipts, bank statements, passbooks, checkbooks, and check registers.

E.      Documents indicating travel in interstate and foreign commerce, to include: airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel and car rental statements; correspondence with travel agencies and other travel-related businesses, airline, rent-a-car, and

hotel frequent flier or user cards and statements, passports and visas.

F.     Firearms, ammunition, stun guns, knives and any other types of dangerous weapons. It may also be necessary to search under floorboards, inside wall panels and behind molding as it has been our experience that the drugs may be hidden in these areas.

G.     For any computer hardware, computer software, computer related documentation, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.     evidence of who used, owned, or controlled the computer equipment;

2.     evidence of computer software that would allow others to control the items, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

3.     evidence of the attachment of other computer hardware or storage media;

4.     evidence of counter forensic programs and associated data that are designed to eliminate data;

5.     evidence of the times the computer equipment was used;

6.     passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.     records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media; and

H.     Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

I.     Items of personal property that tend to identify the person in the residence, occupancy, control, or ownership of the premise that is the subject of this warrant.

J.     Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above.

II.     All computer hardware, computer software, computer-related documentation, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.     During the execution of the search of the Subject Person described in Attachment A-2, law enforcement personnel are authorized to press the fingers (including thumbs) of the Subject Person to the sensor of the subject device and/or to hold the device in front of his face.

## DEFINITIONS

For the purpose of this warrant:

A.     "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

B.     "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cellular telephone, or wireless communication device); any peripheral input/output device (such as a

keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

F.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.     "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party

seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

### *ATTACHMENT A-3*

The premises to be searched and seized are: (1) the following Subject Facebook Account:

**Subject Account 1**:, (2) Facebook user ID: 100024593259380, Screen/User Name:   Carlos Casillas ("Subject Facebook Account"), Profile URL:   https://www.facebook.com/people/Carlos-Casillas/100024593259380/,  other user-generated data stored with this account, and (3) associated subscriber, transactional, and user connection information associated with the account, as described further in Attachment B.  This information is maintained by Facebook, Inc., which accepts service of process at 1601 Willow Road, Menlo Park, CA 94025 and via its law enforcement portal at www.facebook.com/records.

*ATTACHMENT B-3*

I.      **Search Procedure**

A.      Within fourteen days of the search warrant's issue, the warrant will be served on Facebook personnel, who will identify the accounts and files to be searched, as described in Section II below.

B.      The company will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

C.      The company will provide the account duplicate to law enforcement personnel.

D.      Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

E.      Law enforcement personnel may review the account duplicate, even if the company produced it after fourteen days from the warrant's issue, subject to the following limitations.  If the company provided data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view all late-created data that was created by the company, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

II.     **Accounts and Files to Be Copied by Company Personnel**

A.      All data files associated with the Subject Account from the inception of the respective accounts to present, including any materials preserved pursuant to the preservation request initiated on these accounts, in the following categories:

1.   Biographical profile information entered by the user, including data characterized by Facebook, in the following categories:

- "About Me";

- "Date of Birth";

- "Education";

- "Favorite Quotes";

- "Gender";

-  "Hometown";

- "Physical Tokens" ("Badges" added by the user to the account);

- "Political Views;"

- "Religious Views;"

-  "Work".

2.   Information regarding the user's activities on Facebook and on pages with Facebook connections visited while connected to Facebook, including data characterized by Facebook in the following categories:

- "Ads Clicked";

- "Ad Topics";

- "Apps" subscribed to;

- "Likes on Other Sites";

-  "Privacy Settings"

- "Recent Activities";

- "Searches";

- Web pages visited that have a Facebook "Like" button;

3. Communications and messages published, sent or received by the user, including data characterized by Facebook in the following categories:

- "Chat";

- "Messages";

- "Notes;"

- "Photos";

- "Your Posts";

- "Posts By Others";

- "Shares";

- "Status Updates";

- "Videos"

4. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them including any Photo Metadata transmitted with uploaded videos and/or photos;

5. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

6.   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

7.   All IP logs, including all records of the IP addresses that logged into the account;

8.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

9.   All information about the Facebook pages that the account is or was a "fan" of;

10.  All past and present lists of friends created by the account;

11.  All records of Facebook searches performed by the account;

12.  All information about the user's access and use of Facebook Marketplace;

13.  The types of service utilized by the user;

14.  Information about the user's associates, including data characterized by Facebook in the following categories:

   •   "Connections";

   •   "Deleted Friends";

   •   "Family";

   •   "Followers";

   •   "Following";

   •   "Friend Requests";

- "Friends";

- "Groups";

- "Hidden from News Feed" (Friends, apps, or pages hidden from news feed);

- "Likes on Other's Posts";

- "Likes on Your Posts from others";

- "Networks";

- "Pending Friend Requests";

- "Photos";

- "Pokes";

- "Removed Friends";

- "Tag Suggestions Template" (used to help friends "tag" the user in photos that are uploaded

15.    Information regarding the user's location and movements, including data characterized by Facebook in the following categories:

- "Check-ins";

- "Current City";

- "Events";

- "Last Location";

- "Locale";

- "Photos Metadata" (EXIF);

B.    All subscriber and transactional records for this account and any associated accounts, including Instagram accounts linked to this account:

1.    Names, including;

- "Name"

- "Alternate Name"

- "Name Changes"

- "Screen Names"

- "Vanity URL"

2.    Addresses, including;

- "Address"

- "Emails" (addresses, including removed addresses)

- "IP Addresses"

3.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including;

- "Active Sessions"

- "Logins"

- "Logouts"

4.    Length of service and types of service utilized, including;

- "Account Status History"

- "Registration Date"

- "Notification Settings";

- "Privacy Settings";

- List of Types of Facebook services utilized (e.g., "Messages," "Notes")

5.    Telephone or instrument numbers, including;

- • "Phone Numbers"

6.       Other subscriber numbers or identities, including;

- • "Pages You Admin"

- • "Linked Accounts"

7.       Means and source of payment, as well as any records of financial transactions made by or through any of the Subject Account, including;

- • "Credit Cards"

- • "Currency"

8.       All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

9.       All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## III.   Records and Data to be Searched and Seized by Law Enforcement Personnel

A.    Evidence of Sex Trafficking of Children in violation of 18 U.S.C. § 1591(a); Use of Facility of Interstate Commerce to Entice Individual to Engage in Prostitution in violation of 18 U.S.C. § 2422(b); Use of Facility of Interstate Commerce to Promote Unlawful Activity in violation of 18 U.S.C. § 1952(a) and 18 U.S.C. § 1952(b), including:

1.       The identity of the person or persons who have owned or operated the Subject Account or any associated email or other online accounts;

3.       Communications regarding commercial sex involving minors or adults

4.      The existence and identity of any co-conspirators;

5.      The travel or whereabouts or the person or persons who have owned or operated the Subject Account or any associated email or online accounts, and/or any co-conspirator(s), victim, and/or witness;

6.      The identity, location, and ownership of any computer equipment used to access the Subject Account or any associated email or online accounts;

7.      Other e-mail or Internet accounts, telephone numbers, social media services, or web or mobile based applications providing Internet access, remote data storage, or communication services for the users of the Subject Account;

8.      The existence or location of physical media storing electronic data, such as hard drives, CD- or DVD-ROMs, or thumb drives; and

9.      The existence or location of paper print-outs of any data from any of the above.

B.      All of the subscriber, transactional, and logging records described in Section II(B).